In re. Thorpe, Ronald J. Ellett appearing for appellant, David L. Allen appearing for appellee. If it pleases the court, I am Ron Ellett and I am here on behalf of Dr. Thorpe, the appellant. Your Honor, we are here asking for an equitable mortgage so that my client can have back his home and his equity, the home that was given to him by his father back in the 90s. The equitable mortgage is a venerable doctrine that has been around for centuries. It has been recognized by the United States Supreme Court and it has been the subject of a number of Arizona Supreme Court decisions where they have established a set of rules. Can I ask an immediate sort of framing question? I understand there's a lot of equitable arguments you made here, but there was a several part test that the bankruptcy court employed to render her decision, correct? That's correct. Do you believe that's the right test? Absolutely. Okay. So we're not going outside that. We're just talking about how that applies. Right. Why it applies. Thanks. Shelton is the Arizona Supreme Court that established the test originally. It's a six part test. Meriwether, I'm sorry, I said it backwards. Meriwether established the six part test. Shelton added two extra factors. So we referred to those throughout and I believe my opposing counsel did as the Meriwether factors and then the Shelton factors. That is absolutely the test. This is an Arizona law question and we are applying Arizona law to the facts. You're calling it a test. Does that mean that all the factors have to be satisfied or it's something that's in the judge's discretion, that those are things for the court to consider in making the decision? One factor is determinative. Do all the factors have to apply? Shelton has addressed that. The Shelton court, the Arizona Supreme Court, and it said several factors make a compelling case. Okay. I look for the definition of several when you're talking about eight factors. I would suggest that's probably four, five, six of the factors. Does several mean more than two? It means more than two. I wonder if three is several, but yes. So we think we need eight. We don't want a couple to carry too high a burden. We think we need eight. And in fact, my understanding of this case is if this is not an equitable mortgage case, there isn't one. There cannot be one. In this instance, for instance, when we talk about the purchase price being set at exactly the amount that they thought was necessary to require the original mortgage, then they learned, oh, that's mistaken. There's actually $20,000 more owed on this mortgage, so they adjusted the price. So this price, and everybody agrees, this price was set at what is required to pay off the existing mortgage, not what the value of the home is. When you talk about the value of the home, $96,000 was the final purchase price. When you talk about the value of the home, Mr. Thorpe understood it to be over $200,000. He was familiar with what it was selling in the neighborhood at the time. The Zillow at the time was $213,000. Mr. Thorpe was aware of that. Yet the purchase price is $96,000. Subsequent appraisals… Take into consideration that that's significant for maintenance. Well, the subsequent appraisals did. The subsequent appraisals… Were they conditioned? I'm sorry, what? Wasn't there a condition to the appraisal? I mean, was it that the appraisal said this number, but… Well, there are two appraisals. Right. One is at $195,000 and there's no conditions. The other one says that the price is $178,000. That is the defendant's appraisal. And that said, but if you were going to flip this house, you would need to do additional things to it.  But it's still worth $178,000. And that gets to a key issue here. This home is worth at least $178,000. There's an argument made by the opposing side that their client is a flipper. Yes, he's a flipper. He's a baseball player. He's a number of other things. But he's also a hard money lender. That's how he describes himself on his LinkedIn. That is how… And his family business is making loans. He's a member of Sound LLC, as is his brother-in-law and his parents. And they manage… That Sound LLC manages two companies called Arizona Instant Funding and Arizona Instant Funding II. So Arizona Instant Funding made the loan here. They were the assignee on this particular structured transaction. It was structured as a purported sale with a lease with a purchase option. The AmeriFirst Financial, who had a license to actually make a residential loan, was the straw man here in making the original loan that came in. Arizona Instant Funding did an assignment that is dated two days before the close of escrow. So this assignment to Mr. McNaughton's company, the principal of TJ-12, was made two days before they closed. It was always set up that Mr. McNaughton's companies that he controlled would be the lender on this deal. Mr. McNaughton just arranged it so that he also had the title placed into a company he controlled. He wanted complete control of this. In Arizona, in fact anywhere, it's okay if a homeowner loses their home. It's bad. It's sad. But we allow that to happen. But we do not, by law, allow the lender to also walk away with all the equity. And that's what's happened here. That's the harm. Do you see the harm as the avoidance? There might have been an overbid. Yes, yes. And there also should have been additional time with the trustee sale to come up with another solution. How much time was there between the closing of this transaction and the end of the term? Well, that's an excellent question. The option, I believe, contemplated a year. So something could have happened in that time, right? Mr. Thorpe could have done something. But the option was also at a much higher price than what the purchase was. How much higher? I do not, that's one number I do not have. But nothing prevented Thorpe, at least, you may say the market did, but nothing legally prevented Thorpe from taking that year and doing something to acquire the property if he hadn't back sold it. In other words, if you wanted to get at it, if Mr. Thorpe had been more sophisticated and had acted wiser, he wouldn't have lost the equity in his home. That's true. But that's true in every instance where there's an equitable mortgage. So this is a doctrine that is designed to protect people who do make bad decisions. Because people do. That's the whole reason. But he had the smarts to negotiate the option, right? Which not everybody does. He certainly was self-aware to that extent, right? No, the option was drafted freehand by Mr. McNaughton. So that was not Mr. Thorpe's request? No. No, that was the way the deal was structured from the beginning. Because Mr. Thorpe wouldn't have gone along with it without the purchase option. In other words, this ruse of a purported purchase with a lease and a purchase option has always been used by lenders if they can get away from it. And so this was something that Mr. McNaughton, this was something Mr. Thorpe at that point in time would have never understood. And I want to make one point. I think we emphasized this. By the time we get to trial, Mr. Thorpe's case had been pending for years. We had come up to the BAP and got a reversal of an earlier ruling. My client had become very educated about real estate loans, equitable mortgages and things. That was my job to educate him. That's not the fair test, though, to say how sophisticated was this man at the time. At the time, he had never negotiated a real estate contract. He'd never bought a home. He only owned the home because his doctor father gave him the home. And the loan was still in the doctor's name, the original loan. My client, who is a bit of an eccentric airplane model builder, knew nothing about real estate. Now, his mom did. His mom knew how to sell it. Why didn't he go to his mom to sell it? Because he wasn't interested in selling it. He was interested in solving the problem of the $11,000 delinquency. Also, the court was very critical of him not using his brother. His brother and him barely talked. His brother signed over the property at Doug's instruction. And when asked why he did that, he said, Well, Doug's a big boy. I figured he could take care of himself. That was the relationship between the brothers. So we had conflicting evidence at trial. That's what Judge Wansley was looking for. Conflicting evidence. And every time, or not every time, but often she would say, Okay, there's no clear and convincing evidence. You're saying there's no conflicting evidence. There's no evidence that your client requested the option. All of these fundamental facts, you're saying there was no evidence for that? This was a remarkably non-disputed case. I think we had a dispute about whether there was a tarp on the roof at the time. So there were some minor differences. But you have to understand, most of this is written down. There are text messages that were exchanged. And I think both of these witnesses were generally honest. There wasn't this conflicting story of what had happened. Perhaps different perspectives. But it was largely the same story that was being told by both sides. And even like the argument, well, he's not a lender, he's a flipper. It came out clearly he was a lender, and the documents show that. So I'm not asking you to reverse any of her findings of fact. They are what they are. But we still then apply the test to those facts. So that's what has to be done. And that is de novo review. Three people add an extra block to the wall that is the equitable mortgage doctrine that protects distressed borrowers, or you're going to blow a hole in it. That's what you get to do today. And I'm hoping you will build that wall that protects people like Doug Thorpe, and there's a lot of them throughout history, or else we're going to have a hole from this court's decision, and I'm going to be up in the Ninth Circuit saying we've got to fix this. So I would like to reserve the time I've got left. All right, thank you very much. All right, Mr. Allen. May it please the Court, David Allen representing TJ12. Can you hear me okay? Yes. All right, thank you. I'm going to go off script right away and address a couple of misstatements that were made by Mr. Ellett. One misstatement is he said that Mr. McNaughton, at the time of this transaction, was a hard money lender. He tried to make that argument a trial. That argument was rejected. I'm reading from Judge Wansley's decision on page 26 of 28 of the decision of line 13, where it says, at the time of the transaction in August 2013, Mr. McNaughton was not engaged in the business of providing loans on properties. He purchased properties primarily at trustee sales, repaired them often personally, and either flipped them or used them as rentals. So that's simply not true. That's not her factual finding. That is her factual finding. Right. We're not here to decide what's true or not. We're trying to decide whether there's something supportive in the record of that. Correct. And that's her factual finding. Yeah, that is her factual finding, Your Honor, and there's nothing that Mr. Ellett is pointing out on the record that should cause the Court to reject that factual finding. Furthermore, Your Honor's raised the question with Mr. Ellett regarding the option agreement, and, again, I'm going to read from Judge Wansley's decision at page 23 of 28 of line 8, where it says, debtor testified that without the promises found in the option agreement, he would not have instructed his brother William to execute the sales contract. It was clearly the debtor's request to be given an option. Why would TJ-12 care one way or another? They were buying the property. The testimony at trial was that, hey, if he wanted an option, so long as he was willing to pay a price that gave TJ-12 a fair profit, which is what their business was, then fine. He could have the option. And to answer the Court's question, I think the option price was approximately $20,000 or $30,000 higher than the amount that it had been purchased for, and that was to give TJ-12 some profit in the event that the option was exercised. The Meriwether factors do not all have to be met. It's actually ironic that Mr. Ellett says he thought that his client met them all. He certainly did not. But they don't all have to be met, but they do need to all be examined, which is exactly what Judge Wansley does in her 28-page opinion. So I'm just going to go through them quickly. Number one, the prior negotiation of the parties, as found by the trial court, there were no prior negotiations for a loan. TJ-12 and Mr. McNaughton were not in the business at that time of making loans. How could he have – and as the Court says, how could he have thought he was obtaining a loan when he never submitted nor did the trust ever submit any financial information that a lender would request if a loan was being contemplated? Let me ask you a question about that. The trust is the party that's actually doing this transaction, correct? Correct. So whose state of mind is relevant as we examine these factors? I mean it's an unusual case because the party in interest, the party that cares, is not the party that's in effect doing the transaction. Correct, Your Honor, and that is an interest. It makes it interesting, and that goes back to the original time that this case was before this panel, which has to do with the question of the standing in the first place. And Judge Wansley had ordered summary judgment saying that because Mr. Thorpe did not have an ownership interest, a legal ownership interest, he just had a beneficial interest, he had no standing to bring this argument. The Court reversed that finding, said no, a beneficial interest is sufficient, sent it back for this hearing. But to answer your question, I think given that court's ruling, I think we probably need to look at both if there's a state of mind. But again, the Court noted that if Mr. Thorpe truly intended to obtain a loan, then why did he pursue a loan of $14,000, which is all that was needed to reinstate the loan during the two-year period between the notice of the trustee sale and when he first contacted Amerifers to refer him to Mr. McNaughton. There was a two-year period there. All he had to do was get a $14,000 loan. I'd like to read this from the Court's opinion. How is it that such an educated man who says he had no intention of selling the property would allow this transaction to proceed when all the documents unequivocally indicated this was for an absolute transfer? How was Mr. Thorpe established by clear and convincing evidence that the parties intended at the time of this transaction that this was to be a loan and the transfer was simply a means to secure the repayment of the debt? He has not. And that's from page 17 of 28 of the Court's order, which is found in ER 415. So that, I think, puts that first factor to rest pretty well. The second factor is the distress of Granter, which gets into the Court's comment regarding who are we looking at. The actual grantor, of course, was the trust, and there was no evidence whatsoever that the trust had any kind of distress whatsoever, and I think that that's probably the place that you need to look because they're the ones that did the transaction. Mr. Thorpe did not sell his beneficial interest. Mr. Thorpe was not a party to this transaction. It was the trust, so I think that's where we need to look. As to the amount of being close or around the amount to pay an existing indebtedness, it kind of depends on how you look at it. The amount paid of – as the Court notes, as Joss Wonstein notes in her opinion, the amount paid of $96,000 is far in excess of the amount needed, which was only $14,000, to reinstate the mortgage and avoid the pending foreclosure. So on that basis, this factor goes clearly in TJ-12's Court. But she also noted that because the amount was around the same amount needed to pay off a loan in full, that this may – and she used the word may – this may support the filing of an equitable mortgage. So this one we put in the category of it may be on Mr. Thorpe's side. The fourth one, the amount paid compared to the actual value of the property. The Court noted that Mr. McNaughton's testimony was that he was in the business of buying distressed properties, fixing them up and reselling them, and that he had testified that he anticipated another $40,000 to $50,000 to fix the property and believed he could sell it for around $175,000. So when you factor in the profit, that is reasonable, around $25,000, which I think was what the testimony was, that there is not a great disparity at all between the amount paid and the actual value of the property. As for the contemporaneous agreement to repurchase, the fifth factor. Again, we get into this question of who's the party because the option to repurchase was not given to Grantor, the trust. The option was given to Mr. Thorpe, which was not a repurchase. It was simply a purchase because Mr. Thorpe never owned the property. However, again, the Court found on this one that this factor may – and again, the word may is used – support a filing in Mr. Thorpe's favor. So we put this one in that may category. Number six, subsequent act of the parties. The Court noted that TJ-12 paid all the taxes and insurance after acquiring the property, which is not something a lender would do. The Court noted that if the transaction was a loan, then why would TJ-12 borrow money at 18% to buy the property and then only require payments in a much lesser amount so that they were upside down? It makes no sense whatsoever. This one clearly goes in TJ-12's – on TJ-12's side of the ledger. Relative sophistication of the parties. The trial court noted that there's no vast difference between the sophistication of the parties and not much difference between – well, once again, they said there's not much difference. Obviously, the parties are different. Mr. Thorpe has a background in engineering and a very intelligent man. Mr. McNaughton, also an intelligent man, but doesn't have the education Mr. Thorpe has. Again, the Court found this one to be a wash, which I think is correct. And then lastly, the eighth factor is whether one party is in the business of lending money. And as noted earlier, the Court noted that in August 2013, when the subject transaction took place, Mr. McNaughton was not engaged in that business. So now adding up the scorecard, we have the Court finding that clearly in favor of TJ-12 are factors 1, 2, 4, 6, and 8. And maybe – and I use the word maybe, or actually the Court used the word maybe – favoring appellant would be factors 3 and 5. And then neutral is factor 7. And so when you factor in that appellant has the burden here not only to prevail as a more likely-than-not standard, but to prevail on a much tougher standard of clear and convincing evidence of proving that this transaction was a disguised loan, rather than what it clearly appears to be on its face, which is a sales transaction, clearly using those Meriwether factors, appellant has fallen way short. And Judge Wamsley's opinion is correct and should be affirmed. That's all I have unless the Court has questions. I don't. Thank you. Thank you. I can address some of those factors, and I think this is a good illustration of why the Court erred below. The last Meriwether factor – I'm sorry, the last Sheldon factor. Whether Mr. McNaughton or the TJ-12 was engaged in the business of lending, that's the test. The Court applied a different test, whether they were engaged in the business of lending to individuals. That's not the test. The Court does not get to change the test. Why is it relevant that they were engaged in the business of lending? That's why my client went to him in the first place. They were referred by Amerifirst. Doug was seeking a loan, and they went to someone who was in the business of lending. Are you suggesting we'd apply the same test if the borrower-slash-seller was Citibank versus Mr. Thorpe? The whole point of this is it's an individual, right? That's the whole point, isn't it? If all your equitable arguments are being taken seriously, isn't that the point? So isn't it entirely rational that you would define the test that way? The test is whether or not they're engaged in the business of lending or whether they're a lender. Meaning what? Lending to whom, right? Are you suggesting it would be the same analysis if it was Citibank? If Citibank did a lease option purchase, absolutely you'd do the same analysis. But you understand what I'm saying, right? There's some logic. No, I don't. I'm sorry. Then you shouldn't move along. Okay, but that test is not the Shelton test to test whether they were loaned to individuals. And in fact, here, what happened when they did the loan, they took an assignment of the loan that was being made and used a shell company, TJ12, to take title. That can't be the loophole to the equitable argument. I don't think she said it was. What's that? I don't think she said it was. But the effect of applying the test, that's my concern there. That becomes one. The record is clear that he was the manager of two companies that were making loans at that period of time. That's clear. As to the sophistication of the parties, you're talking about a lender, somebody who's never done a loan. You're talking about somebody who could handwrite a purchase option and someone who's never been involved in a purchase option. And again, despite what counsel says, my client didn't request the purchase option. He did testify he would have never done the deal without the purchase option. The amount of the loan, my client was seeking a $14,000 loan. It was TJ12 that steered him to a loan to sell the property for the entire amount of the house. So my client was asking that. He was doing what he could to get a loan. That's where he was going. That was the path he was pursuing. And then we asked the question, how can an intelligent man have entered into the deal? He did. He did do this deal. And that was because he really thought he was selling it for half of what he thought it was worth without listing it when his mom was a realtor? Or was it because he was so unsophisticated that he thought everything would be okay? This was a bad deal. It's such a bad deal, it's not allowed by law. And when you apply these factors, as to the trust, the trust held no interest here except for bare, naked title. The property was supposed to have been transferred to my client 12 years earlier. It was simply an inadvertent error, a ministerial act that should have been done and never was. The trust never paid any of the funds. The trust had no interest in this property. What was the value to him of the fact that the appellee was paying the taxes and paying the difference? He's getting a little bit of rent. He's paying some rent, right? Yes. But they're paying the taxes, they're paying the insurance. It's not an impound situation. Well, I asked him about that on the stand, and he testified, and it's in my reply brief. He set the amount of the payment to include the taxes and the insurance. So in that sense, while he was not following strictly the impound accounting as a lender, he had set the amount so that he was, in essence, collecting each month the money that he would then need to pay out. And by he, I mean Mr. McNaughton. So the parties agreed that the payment was such that, and he testified freely, that's how it was set. So the fact that he's making the payments, again, the court erred there. The fact that he collects the money and then pays it is what a bank does. That's not what a landlord does. When you set the rent, you don't say, oh, well, let's figure out how much my taxes are here and those sorts of things. Also, who is responsible for repairs on this property? My client. In the contract, it says that the repairs will not be the responsibility of TJ-12. Who does that in a real lease? Time's up. All right. Thank you very much for your good arguments. Thank you. Thank you very much. This will be submitted.
judges: Taylor, Lafferty, and Brand